IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIRV Holdings, LLC**<br>2 Bethesda Metro Center<br>Suite 1320<br>Bethesda, MD 20814,<br><br>Plaintiff,<br><br>v.<br><br>**United States General Services**<br>**Administration**<br>1800 F Street, N.W.<br>Washington, D.C. 20405, and<br><br>**Emily W. Murphy**, in her official capacity as<br>Administrator of the United States General<br>Services Administration<br>1800 F Street, N.W.<br>Washington, D.C. 20405, and<br><br>**The District of Columbia**<br>1350 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br><br>Defendants. | Civil Action No. 1:18-cv-1722 |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff MIRV Holdings, LLC ("MIRV" or "Plaintiff"), by and through its counsel,

hereby petitions this Court for a declaratory judgment that the District of Columbia (the

"District") has prevailing authority over the development of the property located at the

intersection of Michigan Avenue, NE and Irving Avenue, NE without interference by Defendant

U.S. General Services Administrator ("GSA") and its Administrator, Emily W. Murphy, because

GSA imposed no limitations on the District when it transferred jurisdiction of the subject

property in 1959 and, in any event, MIRV's intended uses for the subject property, including

residential, shopping, and business uses, are compatible with the uses envisioned by the

Statement of Non-Disturbance agreement entered into between the District and GSA, and in support thereof states as follows:

## INTRODUCTION

1.      This action arises under the Administrative Procedure Act, the Declaratory Judgment Act, the Federal Property and Administrative Services Act of 1949 (as amended by Public Buildings, Property, and Works Act of 2002), and principles of *ultra vires* to enjoin GSA and Ms. Murphy from exceeding their authority by impeding MIRV's development plans otherwise approved by the District, the sole arbiter of the subject property.

2.      40 U.S.C. § 8124 (Westlaw through Pub. L. No. 114-327) (the "Federal Act") and D.C. Code § 10-111 (2012) (the "DC Act") authorize the federal government and the District to swap parcels of land "for purpose of administration and maintenance" under mutually agreed-upon conditions.

3.      Pursuant to the Federal Act and DC Act, GSA engaged in a land swap in 1959 with the District, whereby GSA transferred the jurisdiction of a parcel of land located at the intersection of Michigan Avenue, NE, and Irving Street, NE, also known as Parcel 121/31, in Washington, D.C. (the "Property") to the District.

4.      In exchange, the District relinquished its rights to a similarly sized parcel in the same intersection to GSA (the "Relinquished Property"), which GSA immediately sold to a private party.

5.      The plat, which memorialized this exchange of parcels, included no developmental restrictions on the Property.  In contrast, the 1954 transfer of jurisdiction by GSA to the District of the Relinquished Property included a restriction to use the Relinquished Property only "for highway purposes."

6.      As articulated throughout the Complaint, the District has unequivocally confirmed its decision-making authority over the Property by soliciting the full range of development options for the Property through a request for expressions of interest and development prospectus, and by entering into such agreements as an exclusive rights development agreement and ground lease related to the Property.

7.      With no restrictions in place on the transfer of jurisdiction over the Property, the District, through the Deputy Mayor for Economic Development (the predecessor of the Deputy Mayor for Planning and Economic Development) ("DMPED"), sought bids in the late 1980s from the private sector for plans to develop the Property and improve its economic vitality for the community.

8.      Through this solicitation, the District encouraged bidders to propose the highest and best uses for the Property so long as the uses were compatible with the existing land uses, which were residential and institutional. The District placed great weight on those uses that would maximize the economic and social benefits to the District and its constituents. By seeking the full range of development opportunities, the District focused exclusively on uses advantageous to the District, not the federal government.

9.      By the mid-1980s, the District's Office of Planning ("OP") developed a comprehensive plan (the "Comprehensive Plan"), which included both a future land use map ("FLUM") and the generalized policy map.  In particular, the FLUM of the Comprehensive Plan provided guidance on the then future land uses within the District and designated the Property for mixed-use development of medium-density residential and moderate-density commercial uses.  MIRV's and its predecessors' goals for the Property have always been aligned with the Comprehensive Plan and FLUM, in accordance with the District's expectations for the Property.

10.     In 1990, to quell the developer's concerns regarding the District's legal authority over the Property and to estop GSA from revoking the transfer of jurisdiction, the District entered into a Statement of Non-Disturbance agreement (the "1990 SND") with GSA that set forth the contemplated uses for the Property, including any compatible uses consented to by the District. The 1990 SND further confirmed the District's sole authority to determine the compatible uses for the Property.

11.     Subsequently, the District entered into an amended and restated ground lease (the "Ground Lease") with MIRV for the Property, requiring development of the Property consistent with the terms of the 1990 SND.

12.     MIRV seeks to develop the Property for mixed-use purposes, including but not limited to hotels and conferencing space, office space, restaurant and other retail space, and residential units in accordance with MU-5-B zoning. The District, which is responsible for the administration and maintenance of the Property, approved and consented to MIRV's intended uses, as reflected in DMPED's November 16, 2017 letter of authorization to the District's Zoning Commission (the "Zoning Commission") and the Zoning Commission's May 14, 2018 Order. *See* Exhibit A (DMPED Letter, Nov. 16, 2017); Exhibit B (Zoning Commission Order, May 14, 2018).

13.     Despite the profits reaped by GSA and the lack of restrictions imposed on the Property by GSA in 1959, GSA has stated its intent to prevent MIRV from developing the Property for the uses encouraged and permitted by the District.

14.     GSA, moreover, maintains that, as agent of the owner (the United States of America) of the Property in fee simple, it has final authority to determine how to develop the Property. GSA, in disagreement with the District's authority over the Property, has maintained

that the development of "residential units" on the Property violates the 1990 SND. GSA, in reliance upon a purported violation of the 1990 SND, would seek to revoke the transfer of jurisdiction and destroy the value of the Property, causing the District and MIRV to lose tens of millions of dollars of future income.

15.     As part of its revisionist attempt to impose restrictions not contemplated in the transfer of jurisdiction, GSA has expanded its overly restrictive interpretation of the 1990 SND of prohibiting "residential uses" to now in 2018 argue that "shopping and business uses" are also prohibited. This position contradicts GSA's stance when it considered MIRV's 2008 planned unit development ("PUD"), which envisioned retail usage and a grocery store tenant. Even as recently as October 4, 2017, GSA argued that only "residential uses" were forbidden on the Property, with no mention of the new purported prohibition of "shopping and business uses." And GSA offered no rationale for the prohibition first of "residential uses" and now of "residential, shopping, and business uses."

16.     GSA's threats to revoke the transfer of jurisdiction of the Property have disrupted and continue to interfere with the Ground Lease between MIRV and the District, stalling the development of the Property, and interfering with the streams of income MIRV and the District can earn from the development. Notwithstanding its inability to make the full contemplated use of the Property as required by the Ground Lease, MIRV must continue to remit substantial funds to the District in ground rent and taxes while GSA continues to stymie the allowed uses of the Property.

17.     As a result of GSA's arbitrary actions, MIRV's ability to obtain economically viable financing for the development of the Property is greatly obstructed, and MIRV faces a

constant threat that GSA will revoke its land transfer to the District or otherwise obstruct MIRV's development plans.

18.     MIRV and its predecessors have expended over $4 million in planning their proposed development of the Property and in obtaining the appropriate zoning and other necessary governmental approvals.

19.     GSA's actions have created a shroud of uncertainty over the Property, placing MIRV in a tenuous position where, on the one hand, the District (through DMPED, OP, and the Zoning Commission) has encouraged and effectively required a mixed range of uses for the Property but, on the other hand, the cost to develop the Property to achieve those uses would be lost should GSA follow through with its threat of revocation of jurisdiction.

20.     The District also is harmed by GSA's actions.  MIRV's proposed mixed-use enhancement of the Property would revitalize the Property, resulting in greatly increased tax revenues for the District, employment and housing opportunities for its residents, services to the District and its constituents otherwise not available in the area (*e.g.*, on-the-job training and access to facilities), and a rise in the market value of the surrounding properties. Not surprisingly, the neighboring constituents, by and through their advisory neighborhood commission, fully endorse MIRV's plans to develop the Property.

## JURISDICTION AND VENUE

21.     This action raises federal questions under the Administrative Procedure Act (5 U.S.C. §§ 500 *et seq.*) and the Federal Property and Administrative Services Act of 1949, as amended by Public Buildings, Property, and Works Act of 2002 (40 U.S.C. §§ 101 *et seq.*, including but not limited to 40 U.S.C. § 8124).

22.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331.

23.     This Court has jurisdiction to review federal agency action pursuant to 5 U.S.C. § 702.

24.     This Court has jurisdiction to award the requested declaratory relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and Federal Rule of Civil Procedure 57.

25.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants reside in this district, the acts described in this Complaint occurred in this district, the Property is in this district, and the Defendants are subject to this Court's personal jurisdiction.

## PARTIES

26.     Plaintiff MIRV is a developer in the Washington, D.C. area, with its principal offices located in Bethesda, Maryland. On or about October 9, 2015, MIRV entered into the Ground Lease with the District for the Property. By its terms, the Ground Lease envisions the unobstructed mixed-use development of the Property and reflects the parties' understanding that MIRV's proposal would comply with the transfer of jurisdiction and the 1990 SND. The District, through the Ground Lease, may penalize MIRV unless it develops a certain density for the Property. The District agrees that the feasible way to comply with this density requirement is through the development of residential units, in conjunction with restaurant and other retail space, and other compatible commercial uses under the District's zoning regulations.

27.     Defendant GSA is an agency within the meaning of 5 U.S.C. § 701. The United States of America, acting by and through GSA, is the owner of the Property.

28.     Defendant Emily W. Murphy is the administrator of GSA. She is also an *ex officio* member of the National Capital Planning Commission ("NCPC"). The NCPC is the federal government's central planning agency for the National Capital region, which includes the

Property. D.C. Code § 2-1001(a)(1); *see also* 40 U.S.C. § 8711. The NCPC determines whether a development plan "has a negative impact on the interests or functions of the federal establishment in the National Capital." *Id.* § 2-1002(a)(4)(A); *see also* 40 U.S.C. § 8721.

29.     The District of Columbia is a municipal corporation. GSA transferred jurisdiction of the Property to the District. Through this authority, the District then initiated the development of the Property by seeking the highest and best use of the Property. The District, acting by and through DMPED and pursuant to Mayor's Order No. 2015-071, is the landlord to the Ground Lease for the Property. Under the Ground Lease, the District must fully cooperate and assist with obtaining any governmental approvals necessary to proceed with MIRV's development of the Property.

## FACTUAL BACKGROUND

*The Land Swap*

30.     In the late 1950s, GSA transferred the jurisdiction of a number of properties to the District, many of which included the restrictive language "for highway purposes." *See, e.g.,* Exhibit C (Recorded Land Transfers, Apr. 17, 1957).

31.     On or about January 8, 1959, GSA and the District engaged in a land swap for the Property (the "Land Swap"). Pursuant to 40 U.S.C. § 8124, GSA transferred jurisdiction of the Property to the District. *See* Exhibit D ("Transfer of Jurisdiction, Jan. 1, 1959," marked by the "hatched lines"). The United States of America retained fee simple title to the Property.

32.     In exchange for the Property, the District relinquished its rights to a similarly sized real property located to the north across Irving Street, NE, also known as Parcel 121/22 (the "Relinquished Property"). *See id.* (Marked by the "cross-hatched lines").

33.     The plat, which memorialized the exchange of the Property for the Relinquished Property, did not include any restrictive language, such as "for highway purposes." In contrast, when GSA transferred jurisdiction of the Relinquished Property to the District in 1954, it restricted use of the Property "for highway purposes."

34.     On or about July 17, 1959, GSA sold the Relinquished Property to the Basilica of the National Shrine of the Immaculate Conception for $85,000.00 in fee simple via quitclaim deed. *See* Exhibit E (Quitclaim Deed, July 17, 1959). In other words, GSA profited from the Land Swap.

### *Coordinated Development*

35.     For approximately three decades, the Property remained undeveloped and served as a commuter parking lot, which was served by the District's bus transit system.

36.     In the 1980s, as a consequence of the transfer of the parking and buses, which had previously served the Property, to the nearby Metrorail station, the parking lot became unnecessary for this purpose. At that point, the District pursued productive uses for the Property by consulting the Comprehensive Plan and Ward Plan and issuing a Request for Expressions of Interest ("REI"), which solicited interests in developing the highest and best use of the Property, including hotel and residential uses. *See* Exhibit F (Request for Expressions of Interest, 1986).

37.     Through the REI, the District sought from potential private developers a full range of uses for the Property, not limited in breadth or scope except that the use should be compatible with the surrounding uses of the area, which were residential and institutional. *Id.* at 1.

38.     The REI expressed no reservations that the transfer of jurisdiction limited the development potential of the Property or that the District was in any way restricted in deciding

what to develop on the Property; instead, the REI placed great weight on those uses that may generate for the District, not the federal government, "the most favorable economic and community benefits," ones that maximized the "economic and social benefits to members of the Washington community" and considered the "[r]elationship of the proposed use to the needs of the immediate community and to the City of Washington in general." *Id.* at 1–2, 5.

39.     In August 1988, after surveying the real estate development community for the developmental potential of the Property, the District issued a development prospectus (the "Development Prospectus"). *See* Exhibit G (Development Prospectus, Aug. 3, 1988).

40.     The Development Prospectus identified the development goals of the Property, as articulated in the Comprehensive Plan. These goals included, among others, establishing "mixed-use, medium density residential/institutional development" and generating "for the District [again, not the federal government] the most favorable economic and community benefits." *Id.* at 3.

41.     The Development Prospectus also encouraged developers to propose benefits to the District's constituents in the form of job creation, tax revenue, and non-tangible benefits like access to the facilities. *Id.* at 9.

42.     The District concluded that the best use for the Property was a conference center facility and therefore sought a development and construction partner. *Id.* at 3.

43.     MIRV's predecessor, Conference Center Associates I ("CCA") responded to the Development Prospectus and in November 1989, CCA and the District entered into an exclusive rights development agreement. Like the REI and Development Prospectus, this agreement expressed no reservations about the District's authority to decide how to develop the Property.

44.     To quash CCA's concerns about proceeding with the development and to estop GSA from stalling or otherwise obstructing the development and construction proposal, the District obtained confirmation that, as long as the Property was used for uses approved by the District as compatible with the identified uses, GSA would not seek to revoke the transfer of jurisdiction or take any other action to prohibit development and construction on the Property.

45.     On March 7, 1990, the District entered into the 1990 SND with GSA. The 1990 SND provides in relevant part:

> [A]s long as the aforementioned parcel is used as a conference, training and/or exhibit center, overnight accommodations facility and ancillary uses, such as a restaurant, recreational facilities **and/or** gift shop, ***and/or compatible use and such use is consented to by the District***, GSA will not seek to revoke the transfer of jurisdiction of this parcel to the District, nor will it take other action to prohibit construction, development, maintenance, operation, restoration and/or repair of the facility.

*See* Exhibit H (1990 SND) at 1 (emphasis added).

46.     Leading up to and during the execution of the 1990 SND, GSA (directly or through its agent NCPC) never raised any concern that residential, retail, or other commercial uses were incompatible with the uses envisioned by the 1990 SND. Upon information and belief, given that the projected goals of the Comprehensive Plan and FLUM envisioned the mixed-use development of medium-density residential and moderate-density commercial use of the Property and the adjacent area, it defies common sense for any party to suggest that residential, retail, or other commercial uses would ever be incompatible with the uses articulated in the 1990 SND.

47.     The District has interpreted the last clause of the uses (quoted in the aforementioned paragraph) — "and/or compatible use and such use is consented to by the District" — to confirm the District's sole autonomy and authority to determine the appropriate

use of the Property without the need for GSA approval. Upon information and belief, that language was open-ended not only to further memorialize the District's authority but also because in the infancy stages of the contemplated development, plans and uses were subject to many changes over time.

48.     It is no surprise then, that in a November 29, 1990 correspondence to the Zoning Commission, GSA expressly authorized the District to act as its agent before the Zoning Commission. *See* Exhibit I (GSA Letter, Nov. 29, 1990) at 2.

### Plans for Development

49.     In 1991, the District received and approved an original PUD application for a hotel and conference center, Zoning Case No. 90-3C (the "Original PUD").  Along with the Original PUD, the District's Zoning Commission also considered a request for a related map amendment to designate the Property as a C-2-A Zone District.

50.     Prior to the Zoning Commission's approval of Case No. 90-3C, NCPC offered an opinion regarding the Original PUD. The NCPC determined that the specific uses set forth in the Case (*e.g.*, hotel, conference, training and/or exhibit center) would not "adversely affect the Federal Establishment or other Federal interests in the National Capitol."

51.     Tellingly, while residential purposes were not delineated at this time, the NCPC recognized that the "surrounding area consists primarily of institutional and residential uses. . . . [T]he C-2-A District permits as a matter-of-right law density development including office, retail and all kinds of residential uses. . . ."

52.     In other words, the NCPC was well aware that the District's zoning regulations designated the Property as a zone whose characteristics were compatible with "residential use."

53.     Subsequent to the NCPC's comments, on March 11, 1991, the District's Zoning Commission approved Case No. 90-3C, the Original PUD.

54.     After six approval extensions over nine years, the Original PUD expired in 2000.

55.     On or around December 23, 2008, CCA applied for a Consolidated PUD, First Stage PUD, and a proposed map amendment to develop the Property, referred to as Zoning Case No. 08-33 (collectively, the "2008 PUD").

56.     The Consolidated PUD proposed a first phase of the project, consisting of a 233-room hotel/conference center with approximately 5,000 square feet dedicated to a restaurant use and approximately 20,000 square feet for retail use (the "First Phase").

57.     In contrast, a second phase (memorialized in the First Stage PUD) proposed two buildings with two scenarios, each including residential units or additional hotel/meeting space, as well as parking space (the "Second Phase").

58.     Zoning Case 08-33 also proposed rezoning the Property from "unzoned" to C-3-A to permit the desired building heights and mix of uses.

59.     The District referred Zoning Case 08-33 to the NCPC for its review.

60.     On or about August 27, 2009, the Executive Director of the NCPC recommended that the proposed Consolidated PUD and related map amendment for mixed-use development at the Property "would not be inconsistent with the Comprehensive Plan for the National Capital, nor would it adversely affect any other federal interest." *See* Exhibit J (NCPC Decision on ZC 08-33, Sept. 9, 2003). Tellingly, this position sanctioned the development of the retail space and the possibility of a grocery store (*i.e.*, shopping and business uses) envisioned by the Consolidated PUD.

61.     The Executive Director of the NCPC also advised that the proposed First Stage

PUD for a mixed-use development at the Property "would have an adverse effect on an identified

federal interest because the proposed inclusion of dwelling units is inconsistent with the

acceptable uses stipulated in the [1990 SND]." *See id.* No further explanation was given either

for the conclusion that somehow "residential uses" were not consistent with the 1990 SND or

how this conclusion constituted a "federal interest."

62.     On September 3, 2009, the NCPC held a public hearing during which it discussed

Zoning Case 08-33. *See* Exhibit K (NCPC Hearing on ZC 08-33, Sept. 3, 2003). During the

hearing, the NCPC noted that the "conditions of the transfer" of the Land Swap are on the plat.

*Id.* at 258. The NCPC also recognized that the Consolidated PUD, which it approved,

encompassed "18,000 square feet of retail." *Id.* at 266. And while the NCPC eventually

determined that the Second Phase adversely affected a federal interest solely based on GSA's

interpretation of the 1990 SND, the NCPC Commissioner Hart inquired whether the language

"compatible use and such use is consented to by the District" in the 1990 SND granted the

District sole authority to determine what developmental use is appropriate for the Property. *Id.* at

282–83.

63.     On or about September 9, 2009, NCPC remitted its report to the Zoning

Commission, recommending approval of the First Phase and advising against approval of the

Second Phase. In its decision, NCPC stated:

> GSA has informed staff that it is not prepared to state that the revised
> development proposal for Parcel 121/31 is compatible with the agreement
> it entered into with the District in 1990, nor is it prepared to conclude that
> the proposal would have no adverse affect [sic] on this particular federally
> owned site, or those located nearby. Specifically, GSA is of the opinion that
> the inclusion of dwelling units as part of the proposed 1st Stage PUD is
> inconsistent with the language of the [1990 SND], and that such a use was
> not contemplated at the time the agreement was established.

*See* Ex. J at 7.

64.     Although the 2008 PUD envisioned retail space (including the possibility of a grocery store tenant), neither NCPC nor GSA argued that such retail use violated the 1990 SND. *See id.*

65.     On or about September 14, 2009, the Zoning Commission approved Zoning Case 08-33, including the Second Phase, and rezoned the Property to a C-3-A Zone District, which permits medium-density development, with a general pattern of mixed-use development. *See* Exhibit L (Zoning Commission Order on ZC 08-33, Sept. 14, 2009).

66.     As the Zoning Commission held, its ruling was in accord with the Comprehensive Plan. *Id.* at 13–14, 18. The NCPC also was of the opinion that the Consolidated PUD and related zoning map amendment were consistent with the Comprehensive Plan; interestingly, the NCPC did not opine whether "residential uses" violated the goals articulated in the Comprehensive Plan. *See id.* at 2.

67.     The approved proposal from Zoning Case 08-33 (ZC Order No. 08-33) for the Second Phase is set to expire in December 2018.

### *GSA's Adverse Decision*

68.     During a January 30, 2017 meeting of the Zoning Commission, a member of NCPC—Peter May—expressed his confusion over GSA's prior actions: "And you know, frankly I find this ***baffling on the part of GSA. I don't really understand what their rationale is. It almost seems like they shifted course*** on this but, yeah." *See* Exhibit M (Zoning Commission Hearing, Jan. 30, 2017) (emphasis added) at 72.

69.     On or about August 29, 2017, the DMPED formally expressed by letter its

disagreement with GSA's interpretation of the 1990 SND. *See* Exhibit N (DMPED Letter to

GSA, Aug. 29, 2017).

70.     The DMPED set forth its reading of the 1990 SND and reaffirmed its

determination that "residential use is a compatible use by approval of the PUD and the District

has consented to—and is in support of—the proposed use of the Property." *See id.* at 1–2.

71.     The DMPED requested that GSA affirm its position as to the following specific

points:

> 1) The DMPED's interpretation of the 1990 Statement is true and correct;
> 2) residential is a compatible and allowed use, and;
> 3) GSA will not seek to revoke the transfer of jurisdiction if residential uses
> are developed on the Property.

*See id.* at 2.

72.     In response to the District's interpretation of the 1990 SND in its August 29, 2017

letter, GSA expressed its disagreement by letter dated October 4, 2017. *See* Exhibit O (Response

Letter from GSA to DMPED, Oct. 4, 2017).

73.     First, GSA challenged the District's authority over the Property, arguing that

residential uses were incompatible with the 1990 SND and that the transfer of the Property was

for purposes of "*mere* administration and maintenance," even though neither the Federal Act nor

the DC Act nor case law qualifies "administration and maintenance" as GSA would argue. *Id.* at

1 (emphasis added).

74.     Second, GSA maintained that the District misinterpreted the 1990 SND and, in

particular, the use of the word "compatible."  To GSA, "compatible" must be read in conjunction

with "ancillary," which implies a use that is "subordinate or subsidiary to the primary use" for a

conference, training and/or exhibit center or overnight accommodations facility. GSA outlined

that the 1990 SND provided examples of ancillary uses, such as a restaurant, recreational facilities, and/or gift shop. *See id.* at 1–2. As further support, GSA enclosed a 1990 correspondence from its Regional Administrator that articulated this purported interpretation.

75.     GSA's linguistic interpretation, however, ignores a plain reading of the 1990 SND by excising "and/or compatible use and such use is consented to by the District" from the 1990 SND.  For GSA's interpretation to stand, the "and/or" before "gift shop" must be ignored, which defies common sense.

76.     Third, GSA contended that the Original PUD included no residential component. *See id.* at 2.

77.     In conclusion, GSA refused to affirm that it will not seek to revoke the transfer of jurisdiction if residential uses are developed on the Property. *See id.*  What GSA did not say, however, is that shopping and business uses were inappropriate uses on the Property, as it has more recently contended.

### *Current Development Plans*

78.     Provided the upcoming expiration of ZC Order No. 08-33, on or about November 17, 2017, MIRV applied for a Map Amendment to the Property, Zoning Case No. 17-26 (the "Map Amendment"). *See* Exhibit A (MIRV ZC 17-26 Map Amendment Application, Nov. 17, 2017, and DMPED Letter of Authorization, Nov. 16, 2017).

79.     As articulated in the Comprehensive Plan, the District has encouraged "a preference for mixed residential and commercial uses [on the Property] rather than single purpose uses, particularly a preference for housing above ground floor retail uses." *Id.* at 7. In fact, as part of its vision to create successful neighborhoods, the District seeks the expansion of housing and retail on vacant and underutilized sites. *Id.* at 8–9.

80.     Under the Map Amendment, MIRV sought to zone the Property to the MU-5-B

Zone District with the support of DMPED. The MU-5-B zone designation permits the

development of multifamily residential, hotel, office, retail, and services uses, with a stated

emphasis on residential use.

81.     On April 12, 2018, the Zoning Commission held a public hearing to review

MIRV's Map Amendment. *See* Exhibit P (Transcript of Hearing, Apr. 12, 2018).

82.     Vice Chair Miller acknowledged that the MU-5-B plans, "at least at this point in

today's world, it seems like a much more realistic mix of uses, so hopefully it will facilitate that

mixed use development." *See id.* at 7.

83.     At the conclusion of the April 12, 2018 hearing, the Zoning Commission voted in

favor of the proposed action to approve the Map Amendment. *See id.* at 11–12. The Zoning

Commission memorialized its final action of approval in a May 14, 2018 Order, which also held

that the Map Amendment was not inconsistent with the Comprehensive Plan. *See* Ex. B at 4–5.

84.     On May 3, 2018, NCPC held a meeting to discuss the Map Amendment. Prior to

this meeting, the Executive Director of the NCPC issued his recommendation on April 17, 2018.

*See* Exhibit Q (NCPC Decision on ZC 17-26, Apr. 17, 2018).

85.     The Executive Director of the NCPC issued the following opinion:

> GSA is still of the opinion that the inclusion of dwelling units in any proposal for
> the site is inconsistent with the language of the [1990 SND], and that such a use
> was not contemplated. Accordingly, staff recommends that the Commission
> **advises the Zoning Commission that certain matter-of-right uses in this
> district, such as residential, shopping, and business uses, are inconsistent
> with the acceptable uses stipulated in the [1990 SND] established on March 7,
> 1990 between the District of Columbia government and the U.S. General
> Services Administration**.

*See id.* (emphasis in original).

86.     In other words, NCPC and GSA have now arbitrarily classified "shopping and business uses" as impermissible uses, even though they never raised this concern before. In fact, as noted *supra*, it was quite the opposite.

87.     To date, neither GSA nor the NCPC has offered any reason to deny MIRV's mixed-used development plans other than its overly restrictive, inconsistent, and revisionist interpretation of the 1990 SND.

88.     GSA has improperly treated the 1990 SND itself as an independent federal interest in contravention of the lack of limitations placed on the Transfer of Jurisdiction, Jan. 1, 1959.

89.     This interpretation fails to consider the historical context of the Property, the District's zoning regulations, and the Comprehensive Plan. Notably, neither GSA nor the NCPC relied upon the 1959 plat, which imposed no restriction on the use of the Property, such as "for highway purposes," a restriction GSA has imposed on other transfers of jurisdiction. *See* Ex. D.

### *Need for Judicial Review*

90.     5 U.S.C. § 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

91.     The Court is also permitted to review agency action that is *ultra vires*.

92.     GSA continues to impose itself on the development of the Property, challenging the District's ability to administer the Property on its own, as had been previously agreed.

93.     GSA itself and through the NCPC has further affirmed its interpretation that "residential uses" and now "shopping and business uses" are inconsistent with the 1990 SND and

left open the substantial likelihood for revoking the transfer of jurisdiction of the Property to the District or otherwise disturbing the development of the Property.

94.     MIRV and the District contacted GSA to resolve the parties' disagreement and collaboratively pursue development of the Property.

95.     GSA responded to these good-faith efforts by requesting that MIRV purchase the Property for an amount of money that greatly exceeds the Property's market value. *See* Exhibit R (MIRV Letter Responding to Offer, May 23, 2017).

96.     Indeed, GSA already had received consideration under the Land Swap when it sold the Relinquished Property that the District relinquished to GSA.

97.     Provided that GSA has sustained its decision as to residential, shopping, and business uses, MIRV cannot obtain economically viable financing to support its development plans as agreed in and required by the Ground Lease.

98.     MIRV also faces the potential likelihood of having the land transfer revoked or GSA taking some adverse action that would affect development and construction on the Property.

99.     MIRV and its predecessors have expended well over $4 million in planning its proposed development of the Property and in obtaining the appropriate zoning and other governmental approvals.

100.     Through the Ground Lease, the District has mandated that MIRV develop a certain density of the Property; otherwise, it faces a penalty if that density is not met. The District understands that the most feasible approach to meeting this requirement is through the development of residential units, in conjunction with restaurant and other retail space, and other compatible commercial uses under the District's zoning regulations.

101.     GSA's actions, however, have made it impossible for the District and MIRV to perform this contractual obligation. The District, obligated by the Ground Lease, must cooperate with MIRV by exercising its rights under the transfer of jurisdiction and the 1990 SND to prevent GSA's obstruction.

102.     In effect, GSA's final decision has disrupted and continues to interfere with the Ground Lease between MIRV and District by stalling the development of the Property and interfering with the stream of income MIRV can earn from the development.

103.     Furthermore, GSA's actions impose upon MIRV a burdensome and financial uncertainty should it proceed with the proposed development consented to by the District.

104.     In effect, GSA has usurped the authority granted to the District through the unqualified transfer of jurisdiction and open-ended language of the 1990 SND.

105.     MIRV can seek relief from GSA's decision only through judicial remedy.

### COUNT I (DECLARATORY JUDGMENT ACT; *ULTRA VIRES*)

106.     MIRV incorporates by reference and re-alleges each and every allegation contained in Paragraphs 1–105 herein, as if fully set forth herein.

107.     MIRV seeks a declaration that the actions of GSA are *ultra vires*.

108.     As noted above, the 1990 SND grants the District sole authority to decide how best to use the Property, and therefore GSA lacks any discretion on the proposed development of the Property.

109.     Moreover, unlike other transfers in the late 1950s, in 1959, GSA transferred the jurisdiction of the Property to the District *without* any specific purpose or use, as memorialized in the Transfer of Jurisdiction, Jan. 1, 1959. That is, the 1959 transfer contained no express prohibition of any specific use of the Property.

110.     In addition, 40 U.S.C. § 8124 (Westlaw through Pub. L. No. 114-327) (the "Federal Act") and D.C. Code § 10-111 (2012) (the "DC Act") authorize the federal government and the District to swap parcels of land "for purpose of administration and maintenance" under mutually agreed-upon conditions.

111.     Neither the Federal Act nor the DC Act defines "administration and maintenance."

112.     D.C. courts interpreting the foregoing statutes have determined that "administration and maintenance" is much broader than jurisdiction in the technical sense, understanding it to mean that the recipient of the transfer can determine the purpose and use of the property, even for a use that is different from that for which it had been previously employed.

113.     It follows that the District, in its sole capacity, should determine the appropriate uses of the Property without GSA interference.

114.     In the District's exercise of administration and maintenance of the Property, including determining the use of the Property, GSA should not use the District's action against the District to revoke transfer of jurisdiction or otherwise negatively impact the Property. To be sure, GSA lacks any discretion to decide how MIRV develops the Property, as the authority is vested solely with the District.

115.     In light of the foregoing, MIRV respectfully requests that the Court declare that (1) the District has sole autonomous authority to determine the use and development of the Property without interference from GSA and Ms. Murphy and (2) GSA's actions to be *ultra vires*; and further enjoin GSA and Ms. Murphy from revoking the transfer of jurisdiction of the Property. This is in accord with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, which

authorizes this Court to "declare the rights . . . of any interested party seeking such a declaration."

## COUNT II (ADMINISTRATIVE PROCEDURE ACT;
## DECLARATORY JUDGMENT ACT)

116.    MIRV incorporates by reference and re-alleges each and every allegation contained in Paragraphs 1–115 herein, as if fully set forth herein.

117.    MIRV seeks a declaration under the Administrative Procedure Act and Declaratory Judgment Act that GSA has misread the 1990 SND and that the development of residential, shopping and business uses on the Property is compatible with the 1990 SND.

118.    The 1990 SND provides that GSA will not revoke its transfer of jurisdiction or take other adverse action as long as the Property is used as:

   [i] a conference, training, and/or exhibit center,

   [ii] overnight accommodations facility and ancillary uses, such as a restaurant, recreational facilities and/or gift shop, and/or

   [iii] compatible use and such use is consented to by the District.

119.    In reaching their respective decisions that "residential, shopping and business uses" are not permitted under the 1990 SND, the NCPC and GSA ignore the last entry in the series of appropriate uses of the Property under the 1990 SND, which provides that GSA covenants to the District and agrees that as long as the Property is used for, among other uses, "compatible use and such use is consented to by the District, GSA will not seek to revoke the transfer of jurisdiction . . . ."

120.    The 1990 SND therefore expressly confirms the District's sole authority to determine "compatible uses" of the Property. Even GSA understood this principle: around the same time as the 1990 SND, GSA submitted a memorandum to the District Zoning Commission

authorizing the District to represent GSA throughout the PUD and rezoning approval process. *See* Ex. I at 2.

121.    The District has maintained that the development of residential properties, shopping and business is compatible with the 1990 SND.

122.    The District's decision is supported by more than just the language of the 1990 SND.

123.    The C-2-A Zone District (approved by the Zoning Commission and NCPC in the Original PUD), C-3-A Zone District (approved by the Zoning Commission under the 2008 PUD), and MU-5-B Zone District (approved by the Zoning Commission under the 2017 Map Amendment), all permit residential use as a matter-of-right.

124.    Land uses that are compatible generally are treated alike.  In the District, for example, the zoning regulations permit multi-family residential uses in all Zone Districts (other than Industrial Zone Districts) that include hotels, conference centers, training centers, exhibit centers, restaurants, retail uses, and recreational facilities.

125.    The MU-5-B, C-3-A, and C-2-A Zone Districts all permit the following uses as a matter-of-right:  multi-family residential, office, retail uses, restaurants, bars, hotels, recreation centers and health clubs, and colleges/universities.

126.    In a number of important ways, the zoning regulations (both the 1958 zoning regulations and the 2016 zoning regulations) treat multi-family residential use and hotel use as approximately the same, thereby indicating the compatibility of the two uses.  For example, the 1958 zoning regulations treated guestroom areas of hotels as "apartment house or other residential use" when calculating the allowable gross floor area for a hotel.  D.C. Mun. Regs. Tit. 11, § 771.7 (1958).  Similarly, the 2016 zoning regulations count the total square footage of a

hotel (defined as a "lodging" use) with less than 30 rooms as residential gross floor area; and for hotels that have more than 30 rooms, the areas devoted to guest rooms and service areas of the hotel are counted towards the building's residential gross floor area.  D.C. Mun. Regs. Tit. 11, Subtitle B, §§304.2(d) and 304.2(e) (2016).

127.    Similarly, in the 1958 zoning regulations, hotel rooms and multi-family residential use were treated identically for parking purposes:  both types of uses must provide one off-street parking space per every two units.  D.C. Mun. Regs. Tit. 11, § 2101.1 (1958).

128.    We see this harmony in other jurisdictions.  For example, the zoning ordinance of Arlington, Virginia, has a "Multiple-Family Dwelling and Hotel District" that encourages moderate and high-rise multi-family and hotel development in areas well-served by Metro transit.  Both uses have identical parking requirements of one off-street space per unit.  The compatibility is also evident in Boston, which treats multi-family residential uses and hotel uses identically with respect to numerous aspects of land use regulation.  In fact, Boston designates a hotel use as a residential use.  As a final example, the Coastal Zone Management Program, overseen by the Department of Commerce, also treats apartments and hotels alike, noting that they are treated together as distinct from industrial, recreational, civic and transportation uses.

129.    In its consideration of Case No. 90-3C, the Original PUD, NCPC offered an opinion in which it recognized that the "surrounding area consists primarily of institutional and residential uses …. [T]he C-2-A District permits as a matter-of-right low density development including office, retail and all kinds of residential uses . . . ."  That is, the NCPC understood the harmony between the two uses.

130.    Furthermore, GSA's animus towards "residential, shopping and business uses" on the Property is inaccurate because it ignores the operative language in the 1990 SND and actions

by the NCPC and GSA taken in relation to neighboring properties.  In close proximity to the

Property is a residential facility called the Armed Forces Retirement Home ("AFRH").

131.    As recently as March 2018, NCPC considered and approved the private

development of residential units on federal land under the AFRH Master Plan Amendment,

together with hotel, retail, and office space.

132.    This NCPC approval underscores the compatibility of residential properties with

retail and office space in the area encompassing the Property.

133.    There are countless examples of potential private development of residential and

commercial uses on federal land. Two nearby examples include (1) the Southwest Ecodistrict

Initiative and (2) the Southeast Federal Center. Both envision mixed-use development on public

property.

134.    Despite this explicit compatibility between commercial and residential purposes,

GSA claims otherwise and its threat of revocation has caused MIRV to suffer a legal wrong and

adversely affected and aggrieved MIRV, as described throughout the Complaint.

135.    And, to make matters worse, GSA has vocalized inconsistent positions over the

years. In 2009 and as recently as 2017, GSA never articulated that "shopping and business uses"

were prohibited uses on the Property. In August 2009, it endorsed the Consolidated PUD, which

proposed the construction of retail space and the attraction of a grocery store. In October 2017,

GSA opined that only residential units were impermissible uses under its reading of the 1990

SND. Now, with its position reversed, and without any indication what the vague phrase

"shopping and business uses" may encompass, GSA continues to read into the 1990 SND

restrictions that were never mutually considered by the parties, all to the detriment of MIRV and

the District.

136.    GSA's Response Letter dated Oct. 4, 2017 (Ex. O) constitutes final agency action under the APA.  5 U.S.C. §§ 702–04.

137.    The APA empowers this Court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

138.    By threatening to revoke jurisdiction over the Property, GSA has stymied MIRV's efforts to develop the Property, which would (among other reasons) benefit the constituents of the District and finally put to rest the decades-long non-use of the Property.  Already, MIRV has suffered because of the substantial amounts of funds it has expended to plan the development and seek the necessary re-zoning of the Property, and the lengthy delays it will continue to experience before the possibility of realizing a sufficient return on its investments.

139.    In light of the foregoing, MIRV respectfully requests that the Court declare that (1) the development of residential, shopping and business uses on the Property is compatible with the uses envisioned in the 1990 SND and/or (2) the District decides this compatibility; and further enjoin the GSA and Ms. Murphy from revoking the transfer of jurisdiction of the Property. This is in accord with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, which authorizes this Court to "declare the rights . . . of any interested party seeking such a declaration."

**PRAYER FOR RELIEF**

140.    WHEREFORE, MIRV prays for judgment and relief as follows:

a.    A declaration that the District has sole autonomous authority to determine the use and development of the Property without interference from GSA.

b.      A declaration that the District solely determines what is a compatible use envisioned by the 1990 SND.

c.      A declaration that residential units, shopping, and business uses and other uses authorized by the District are allowed uses of the Property because they are compatible with the 1990 SND and the Transfer of Jurisdiction, Jan. 1, 1959.

d.      A declaration that GSA's agency action is *ultra vires*.

e.      Injunctive relief enjoining GSA and/or Emily W. Murphy from revoking the transfer of jurisdiction of the Property.

f.      Such other and further relief as the Court deems just and proper.

DATED:  July 24, 2018                    Respectfully submitted,

                                         SEYFARTH SHAW LLP

                                         By: _____
                                             Thomas T. Locke (D.C. Bar No. 454144)
                                             tlocke@seyfarth.com
                                             James Billings-Kang (D.C. Bar No.
                                             984152)
                                             jbillingskang@seyfarth.com
                                             SEYFARTH SHAW LLP
                                             975 F Street, N.W.
                                             Washington, DC  20004-1454
                                             Telephone:  (202) 463-2400
                                             Facsimile:   (202) 828-5393

                                             *Attorneys for Plaintiff MIRV Holdings,*
                                             *LLC*