UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MIRV HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-1722 (RBW) |
| | ) | |
| UNITED STATES GENERAL SERVICES ADMINISTRATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The plaintiff, Mirv Holdings, LLC, brings this civil action against the United States General Services Administration ("GSA"); Emily Murphy, in her official capacity as the Administrator of the GSA (collectively, the "federal defendants"); and the District of Columbia (the "District") (collectively, the "defendants"), pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2018), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (2018). See First Amended Complaint for Declaratory Judgment ("Am. Compl." or the "Amended Complaint") ¶ 1. Currently pending before the Court are the Federal Defendants' Motion to Dismiss ("Fed. Defs.' Mot.") and the Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."). Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant in part and deny as moot in part the federal defendants' motion to dismiss and deny as moot the plaintiff's motion for summary judgment.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Complaint for Declaratory Judgment ("Compl."); (2) the Plaintiff's Memorandum of Points and Authorities in Opposition to GSA's Motion to Dismiss ("Pl.'s Opp'n"); (3) the Federal Defendants' Reply in Support of Motion to Dismiss ("Fed. Defs.' Reply"); (4) the Plaintiff's Sur-Reply in Response to Issues Raised for the First Time in GSA's Reply in Support of Motion to Dismiss ("Pl.'s Sur-Reply"); and (5) the Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Pl.'s Mem.").

I.   BACKGROUND

In January 1959, the "GSA transferred the jurisdiction of a parcel of land located at the intersection of Michigan Avenue, N[ortheast], and Irving Street, N[ortheast], . . . in [the] [District of Columbia] (the '[p]roperty') to the District," but "retained fee simple title to the [p]roperty." Am. Compl. ¶¶ 3, 31. Allegedly, the agreement that memorialized the transfer of the property "included no development restrictions on the [p]roperty." Id. ¶ 5; see also id. ¶ 33 ("The plat, which memorialized the exchange of the [p]roperty for the [r]elinquished [p]roperty, did not include any restrictive language[.]"). "By the mid-1980s, the District[ ] . . . designated the [p]roperty for mixed-use development of medium density residential and moderate-density commercial uses." Id. ¶ 9; see also id. ¶ 40 (identifying the development goals of the property as, inter alia, establishing "mixed-use, medium density residential/institutional development" and generating "for the District . . . the most favorable economic and community benefits").

In 1989, the District and the plaintiff's predecessor, Conference Center Associates I, LLC ("Conference Center Associates") entered into an agreement pursuant to which Conference Center Associates had exclusive rights to develop the property. See id. ¶ 43. Thereafter, on March 7, 1990, "[t]o quash [the Conference Center Associates'] concerns about proceeding with the development and to estop [the] GSA from stalling or otherwise obstructing the development and construction proposal," the District entered into a Statement of Non-Disturbance agreement with the GSA (the "1990 agreement"), which provides that "as long as the [p]roperty was used for uses approved by the District as compatible with the identified uses, [the] GSA would not seek to revoke the transfer of jurisdiction or take any other action to prohibit development and construction on the [p]roperty." Id. ¶ 44; see also id. ¶ 10 ("In 1990, to quell the [Conference Center Associates'] concerns regarding the District's legal authority over the [p]roperty and to

estop [the] GSA from revoking the transfer of jurisdiction, the District entered into a Statement of Non-Disturbance agreement . . . with [the] GSA that set forth the contemplated uses for the [p]roperty and permitted any compatible uses consented to by the District."). Specifically, the 1990 agreement states that

> as long as the [ ] [property] is used as a conference, training and/or exhibit center, overnight accommodations facility and ancillary uses, such as a restaurant, recreational facilities and/or gift shop, and/or compatible use and such use is consented to by the District, [the] GSA will not seek to revoke the transfer of jurisdiction of this [property] to the District, nor will it take other action to prohibit construction, development, maintenance, operation, restoration and/or repair of the facility.

Id., Exhibit ("Ex.") H (Statement of Non-Disturbance) at 1. According to the plaintiff, "[t]he District has interpreted the last clause of the uses [of the subject property] . . .—'and/or compatible use and such use is consented to by the District'—to confirm the District's authority to determine the appropriate use of the [p]roperty." Id. ¶ 47.

In 1991, the Conference Center Associates submitted a planned unit development application for the construction of a hotel and conference center on the subject property (the "original development plan"). See id. ¶ 49. The National Capital Planning Commission, "the federal government's central planning agency . . . [that] determines whether a development plan has a negative impact on the interests or functions of the federal establishment in the [n]ational [c]apital," reviewed the original development plan and "determined that the specific uses set forth [there]in . . . would not adversely affect the [f]ederal [e]stablishment or other [f]ederal interests in the [n]ational [c]apitol." Id. ¶¶ 28, 50 (internal quotation marks omitted). Thereafter, on March 11, 1991, "the District . . . approved [the] original [development plan]." Id. ¶¶ 49, 53. However, "[a]fter six approval extensions over nine years, the [o]riginal [development plan] expired in 2000." Id. ¶ 54.

3

In December 2008, the Conference Center Associates "applied for a [c]onsolidated [planned unit development]"on the subject property, which "proposed a first phase . . . , consisting of a 233-[]room hotel/conference center with approximately [5000] square feet dedicated to a restaurant use and approximately 20,000 square feet for retail use," and a second phase that consisted of "residential units or additional hotel/meeting space, as well as parking space" (the "consolidated development plan"). Id. ¶¶ 55–57. "The District referred [the consolidated development plan] to the [National Capital Planning Commission] for its review." Id. ¶ 59. The National Capital Planning Commission advised the District that the first phase would not "adversely affect any [ ] identified federal interests," but that the second phase "would have an adverse effect on an identified federal interest because the proposed inclusion of dwelling units is inconsistent with the acceptable uses stipulated in the [1990 agreement]." Id., Ex. J (Commission Action); see also id., Ex. J (Staff Recommendation) at 7 ("[The] GSA . . . is not prepared to state that the [consolidated] development [plan] . . . is compatible with the [1990] agreement . . . , nor is it prepared to conclude that the [consolidated development plan] would have no adverse [e]ffect on this particular federally owned site, or those located nearby. Specifically, [the] GSA is of the opinion that the inclusion of dwelling units . . . is inconsistent with the language of the [1990 agreement], and that such a use was not contemplated at the time the [1990] agreement was established."). Nevertheless, on September 3, 2009, the National Capital Planning Commission approved the consolidated development plan. See id., Ex. J (Letter from Marcel Acosta, Executive Director, National Capital Planning Commission, to the Zoning Commission of the District of Columbia (Sept. 9, 2009)). Thereafter, the Zoning Commission of the District of Columbia (the "Zoning Commission") approved the consolidated development plan, but noted that it "takes no position as to whether the inclusion of the dwelling

units is inconsistent with the acceptable uses stipulated in the [1990 agreement]," and that the Conference Center Associates "proceeds at its own risk with respect to the [1990 agreement]." Id., Ex. L (Zoning Commission Order No. 08-33) at 2–3.

In 2015, the plaintiff entered into a lease with the District for the plaintiff's use of the property. See id. ¶ 26. The lease "envisions the unobstructed mixed-use development of the [p]roperty" and "require[es] [such] development of the [p]roperty [to be] consistent with the terms of the 1990 [agreement]." Id. ¶¶ 11, 26.

On August 29, 2017, the District "requested that [the] GSA formally affirm its position as to [whether] . . . residential [use] is a compatible and allowed use [of the property]." Id. ¶ 72; see also id., Ex. N (Letter from Brian T. Kenner, Deputy Mayor, to Houston Taylor, Regional Administrator, Federal Acquisition Service, United States General Services Administration (Aug. 29, 2017) ("August 29, 2017 Letter")) at 2. The District also indicated that it disagreed with the GSA's "informal position that residential use is inconsistent with the 1990 [agreement]," stating that "[t]he 1990 [agreement] clearly states . . . that a 'compatible use' [that] is 'consented to [ ] by the District' would not be disturbed by the GSA," and that "the Zoning Commission has determined residential use is a compatible use by approval of the [consolidated development plan] and the District has consented to—and is in support of—the proposed use of the [p]roperty." Id., Ex. N (August 29, 2017 Letter) at 1–2. In response, the GSA stated that it "disagree[d] with the District's . . . interpretation of the [1990 agreement]," explaining that "[t]he phrase 'and/or compatible use' cannot be read in isolation and instead must be read in conjunction with allowable 'ancillary use,'" and that "[a]ncillary uses are those subordinate or subsidiary to the primary use for a 'conference, training and/or exhibit center, overnight accommodations facility' and . . . residential use would not be subordinate or subsidiary to a

'conference, training and/or exhibit center, overnight accommodations facility.'" Id., Ex. O (Letter from Mary D. Gibert, Regional Commissioner, Public Buildings Service, to Brian T. Kenner, Deputy Mayor, Office of Planning and Economic Development (Oct. 4, 2017)) at 1–2.

Because the approval of the consolidated development plan was scheduled to expire in December 2018, see id. ¶¶ 67, 79, in November 2017, the plaintiff applied for a "[m]ap [a]mendment to the [p]roperty," id. ¶ 79, which sought to zone the property as a "MU-5-B Zone District," a zone designation that would permit "the development of multifamily residential, hotel, office, retail, and services uses, with a stated emphasis on residential use[,]" id. ¶ 81. The Zoning Commission approved the plaintiff's map amendment on April 12, 2018. See id. ¶ 84; see also id., Ex. B (Zoning Commission Order No. 17-26) at 1. However, when the plaintiff's map amendment was submitted to the National Capital Planning Commission for its recommendation, the Executive Director of the National Capital Planning Commission advised that "certain matter-of-right uses . . . such as residential, shopping, and business uses, are inconsistent with the acceptable uses stipulated in the [1990 agreement]." Id., Ex. Q (Executive Director's Recommendation) at 3.

As a result of the Executive Director's Recommendation, on July 24, 2018, the plaintiff filed its Complaint against the defendants, see Compl. at 1, and on February 28, 2019, the plaintiff filed its Amended Complaint, see Am. Compl. at 1. Thereafter, the federal defendants filed their motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), see Fed. Defs.' Mot. at 1, and while that motion was still pending, the plaintiff filed its motion for summary judgment pursuant Federal Rule of Civil Procedure 56, see Pl.'s Mot. at 1. These motions are the subjects of this Memorandum Opinion.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(1) Motion to Dismiss

Federal district courts are courts of limited jurisdiction, Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[.]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to dismiss a claim if it "lack[s] [ ] subject matter jurisdiction[.]"  Fed. R. Civ. P. 12(b)(1).  And, because "it is to be presumed that a cause lies outside [ ] [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint."  Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).  Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'"  Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d

970, 972 (D.C. Cir. 2005)).  However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original) (citation and internal quotation marks omitted).

**B.      Rule 12(b)(6) Motion to Dismiss**

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth."  Iqbal, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citing Twombly, 550 U.S. at 555).  Also, the Court need not accept "legal conclusions cast as factual allegations," or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint."  Hettinga, 677 F.3d at 476.  The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the

complaint[,] and matters of which [the Court] may take judicial notice." Equal Empl't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

**C.     Rule 56 Motion for Summary Judgment**

The Court may grant a Rule 56 motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Id.  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position . . . [is] insufficient" to withstand a motion for summary judgment; rather,

9

"there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III. ANALYSIS

The federal defendants argue that the Amended Complaint should be dismissed pursuant to Rule 12(b)(1) because the plaintiff "lacks standing for its claims[.]"[2] Fed. Defs.' Mot. at 13 (capitalization removed). Specifically, the federal defendants argue that the plaintiff "has failed to demonstrate any 'injury in fact' that rises beyond the level of pure speculation" and that it "cannot demonstrate either traceability or redressability." Id. at 13–14. The plaintiff responds that the Amended Complaint should not be dismissed because it "has standing to pursue its claims against [the] GSA," see Pl.'s Opp'n at 14 (capitalization removed), and additionally, that summary judgment should be awarded to the plaintiff pursuant to Rule 56 because the GSA's misinterpretation of the 1990 agreement results in a violation of the APA, see Pl.'s Mem. at 19.

The Court's analysis starts and ends "with the question of subject matter jurisdiction." Am. Freedom Law Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015) (Walton, J.) (quoting Aamer v. Obama, 742 F.3d 1023, 1028 (D.C. Cir. 2014)). "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) (citing U.S. Const. art. III, § 2). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed justiciability doctrines, among which are standing[,] ripeness, mootness, and the political question doctrine." Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (internal quotation marks omitted).

---

[2] The federal defendants also argue that the Amended Complaint should be dismissed pursuant to Rule 12(b)(6) because the plaintiff "fails to state a claim under the APA due to the lack of final agency action." Fed. Defs.' Mem. at 6 (capitalization removed). Because the Court finds that the plaintiff lacks standing in this case, the Court need not address the merits of this additional argument.

10

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (second to sixth alterations in original) (citations and internal quotation marks omitted). If a plaintiff lacks Article III standing, the Court

> need not delve into [a plaintiff's] myriad constitutional and statutory claims . . . because [ ] [the] [C]ourt may not resolve contested questions of law when its jurisdiction is in doubt, as [h]ypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning.

Am. Freedom Law Ctr., 106 F. Supp. 3d at 108 (first, sixth, and seventh alterations in original) (citations and internal quotation marks omitted).

Here, the plaintiff alleges the following six injuries purportedly caused by the federal defendants' conduct: (1) its loss of "nearly $5 million [spent] in plans to develop the [p]roperty and in obtaining appropriate zoning, along with other requisite approvals[,]" Pl.'s Opp'n at 16 (citing Am. Compl. ¶ 98); (2) its expenditure of an additional $2 million in fees to "rework its initial development plans[,]" "as a direct consequence [of the] GSA's [position,]" id. (citing Am. Compl. ¶ 100); (3) its "[in]ability to obtain the necessary financing for the residential development of the [p]roperty," id. (citing Am. Compl. ¶¶ 17, 96; (4) the "stall[ing] [of] [the plaintiff's] development of the [p]roperty and interfer[ence] with the stream of income [that the plaintiff] can earn from the development," id. (citing Am. Compl. ¶¶ 16, 98); (5) the "constant threat that [the] GSA will revoke its land transfer to the District or otherwise obstruct [the plaintiff's] development plans because [the] GSA has threatened that it will do so if [the plaintiff] or the District is non-compliant," id. (citing Am. Compl. ¶¶ 17, 97); and (6) its

11

"continu[al] [ ] remit[tance] of substantial funds to the District [each year], nearly $500,000 in ground rent and taxes" id. (citing Am. Compl. ¶¶ 16, 99).  The Court will address each purported injury in turn.

As to the plaintiff's first two alleged injuries, its past expenditure of approximately $7 million, see Pl.'s Opp'n at 16, "[i]n a case of this sort, where the plaintiff[ ] seek[s] declaratory and injunctive relief," Dearth v. Holder, 641 F.3d 499, 501 (D.C. Cir. 2011); see Am. Compl. ¶ 131 (asking the Court to grant declaratory and injunctive relief), "past injuries alone are insufficient to establish standing[,]" Dearth, 641 F.3d at 501; see also O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").  Therefore, the plaintiff cannot rely on these claimed injuries to establish standing.

As to the plaintiff's third purported injury, its "[in]ability to obtain the necessary financing for the residential development of the [p]roperty," Pl.'s Opp'n at 16,[3] this allegation is an "[a]llegation of possible future injury[,] [which] [is] not sufficient" to establish an injury in fact, Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013).  "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  Susan B. Anthony List, 573 U.S. at 158 (internal quotation marks omitted); see also City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) ("[The] [p]laintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which

---

[3] The plaintiff also argues that it has suffered an injury in fact because the "GSA's position further puts [the plaintiff] at an increased risk of losing existing financial support or the District's terminating its lease."  Pl.'s Opp'n at 16.  However, the plaintiff does not allege this as an injury in its Amended Complaint, see generally Am. Compl., and "it is a well-established principle of law in this Circuit that a plaintiff may not amend [its] complaint by making new allegations in [the] opposition brief[,]" Budik v. Ashley, 36 F. Supp. 3d 132, 144 (D.D.C. 2014) (Walton, J.) (citing Larson v. Northrop Corp., 21 F.3d 1164, 1173–74 (D.C. Cir. 1994)).  Therefore, the Court will not address whether this injury is sufficient to establish the plaintiff's standing in this case.

sharpens the presentation of issues' necessary for the proper resolution of constitutional questions."). However, while the Court must "grant[] [the] plaintiff the benefit of all inferences that can be derived from the facts alleged," Am. Nat'l Ins. Co., 642 F.3d at 1139, the Court "may reject as overly speculative those links [that] are predictions of future events (especially future actions to be taken by third parties)[,]" United Transp. Union v. Interstate Commerce Comm'n, 891 F.2d 908, 912 (D.C. Cir. 1989). Here, the plaintiff has failed to allege that it will sustain in the immediate future injury flowing from the GSA's position that residential use is incompatible with the 1990 agreement. See Lyons, 461 U.S. at 102 ("[A] plaintiff [must] demonstrate that "he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate[.]'"). However, merely alleging that it has been injured by the federal defendants' actions because its "ability to obtain economically viable financing for the development of the [p]roperty is greatly obstructed" is speculative and contingent upon future events. Am. Compl. ¶ 17. In fact, this purported injury relies on "a highly attenuated chain of possibilities[,]" Clapper, 568 U.S. at 410, including (1) that the plaintiff will seek future financing, (2) that the plaintiff will be eligible to obtain such financing, and (3) that the third-party lender would grant the plaintiff's application for financing, and the Court cannot conclude that there is a substantial risk that the plaintiff's inability to obtain financing from investors is the fault of the GSA's actions. Accordingly, this alleged injury does not provide a basis for finding that the plaintiff has suffered an injury in fact.

As to the plaintiff's fourth and fifth purported injuries—the "stall[ing] [of] [the plaintiff's] development of the [p]roperty and interfer[ence] with the stream of income [that the plaintiff] can earn from the development" and the "constant threat that [the] GSA will revoke its

13

land transfer to the District or otherwise obstruct [the plaintiff's] development plans because [the] GSA has threatened that it will do so if [the plaintiff] or the District is non-compliant," Pl.'s Opp'n at 16—these allegations are insufficient to establish standing in this case because they amount to self-inflicted injuries.  The plaintiff knew of the GSA's position that "the proposed inclusion of dwelling units is inconsistent with the acceptable uses stipulated in the [1990 agreement]" in 2009, but nevertheless chose to proceed with its development plans, which included the dwelling units, despite having knowledge regarding the GSA's position.  Am. Compl., Ex. J (Commission Action).  In fact, when the Zoning Commission approved the consolidated development plan, it noted that it "takes no position as to whether the inclusion of the dwelling units is inconsistent with the acceptable uses stipulated in the [1990 agreement]," and that the plaintiff's predecessor "proceeds at its own risk with respect to the [1990 agreement]."  Id., Ex. L (Zoning Commission Order No. 08-33) at 2–3.  Therefore, any injury suffered by the plaintiff is "substantially caused by the plaintiff's own conduct," thereby "sever[ing] the causal nexus needed to establish standing."  Ellis v. Comm'r of Internal Revenue Serv., 67 F. Supp. 3d 325, 336 (D.D.C. 2014), aff'd, 622 F. App'x 2 (D.C. Cir. 2015); see also Grocery Mfrs. Ass'n v. Envtl. Prot. Agency, 693 F.3d 169, 178 (D.C. Cir. 2012).

Finally, as to the plaintiff's sixth purported injury—its "continu[ed] [ ] remit[tance] [each year] [of] . . . nearly $500,000 in ground rent and taxes," Pl.'s Opp'n at 16—in order for an injury to confer standing, it must also be "likely . . . that the [plaintiff's] injury will be redressed by a favorable decision[,]" Lujan, 504 U.S. at 561 (internal quotation marks omitted).  Here, the plaintiff fails to address in its opposition how this alleged injury will be redressed by a declaration that "residential units, shopping, and business uses and other uses authorized by the District are allowed uses of the [p]roperty because they are compatible with the 1990

14

[agreement]" and an injunction "enjoining [the federal defendants] from revoking the transfer of jurisdiction of the [p]roperty"—its requested relief.  Am. Compl. ¶ 131.  In fact, the Court is unable to determine how "the relief sought, assuming that the [C]ourt [could] [ ] grant it, will likely alleviate the particularized injury," Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663–64 (D.C. Cir. 1996), because the plaintiff would nevertheless be required to pay to the District $500,000 each year in rent and taxes regardless of a favorable decision by the Court in this case.  Therefore, this purported injury is also insufficient to confer standing on the plaintiff.

In sum, the Court finds that the plaintiff has failed to establish that any of its alleged injuries are sufficient to confer standing necessary to establish this Court's subject matter jurisdiction over the case.[4]  Therefore, the Court will grant the federal defendants' motion to dismiss to the extent that it seeks dismissal of the Amended Complaint pursuant to Rule 12(b)(1) and deny as moot the motion in all other respects.  And, because the Court has concluded that it lacks subject matter jurisdiction over the case, the Court cannot address the merits of the plaintiff's motion for summary judgment and will also deny that motion as moot.

### IV.  CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny as moot in part the federal defendants' motion to dismiss.  Specifically, the Court must (1) grant the defendant's motion to dismiss pursuant to Rule 12(b)(1) because the plaintiff has failed to establish that it has standing to pursue its claim and (2) deny as moot the motion in all other

---

[4] Upon review of the Amended Complaint, the Court concludes that this deficiency is fatal not only to the plaintiff's claim against the federal defendants but also to the plaintiff's claim against the District.  See generally Am. Compl. (failing to allege that the plaintiff has been injured by the District).  Therefore, the Court must dismiss the Amended Complaint in its entirety as to all of the defendants, including the District, despite the fact that the District has not sought dismissal of the plaintiff's claim against it.  See Athens Cmty. Hosp., Inc. v. Schweiker, 686 F.2d 989, 992 (D.C. Cir. 1982) ("It is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue sua sponte."); Poblete v. U.S. Marshals Serv., 207 F. Supp. 3d 1, 2–3 (D.D.C. 2016) ("[A] district court may dismiss a complaint sua sponte . . . when it is evident that the court lacks subject matter jurisdiction.").

15

respects.  The Court further concludes that it must also deny as moot the plaintiff's motion for summary judgment because the Court lacks subject matter jurisdiction over the case.

**SO ORDERED** this 15th day of April, 2020.[5]

REGGIE B. WALTON  
United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.